## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Apogee Enterprises, Inc., on behalf of the Apogee Enterprises, Inc. 401(k) Retirement Plan,<br><br>Plaintiff,<br><br>vs.<br><br>State Street Bank and Trust Company; and ING Institutional Plan Services LLC, formerly known as CitiStreet LLC,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil No. _____

**COMPLAINT**

**Jury Trial Demanded**

## PRELIMINARY STATEMENT

1.      Defendants State Street Bank and Trust Company and CitiStreet LLC served as ERISA fiduciaries and plan administrative service providers to the Apogee Enterprises Inc. 401(k) Retirement Plan (the "Plan") from 1999 to the present. Throughout that period, Apogee Enterprises, Inc. ("Apogee"), which serves as the Plan's sponsor, plan administrator and named fiduciary, relied on defendants' representations describing the investment strategy of the State Street Daily Bond Market Fund (the "Fund") in deciding to invest a portion of the Plan's assets in the Fund. Starting in 1999 (when Apogee first selected the Fund as one of the Plan's investment options) and continuing up to 2007 (when Apogee exited the Fund), defendants continuously represented the Fund to be a "conservative," "stable," "risk-controlled," and "well-diversified" "enhanced bond index fund."

2.      Contrary to these representations, however, in 2006, State Street changed the strategy of the Daily Bond Market Fund without disclosing that fact to Apogee.  State Street changed the Fund's investment strategy by investing ever greater amounts of the Fund's assets in high-risk investments, including securities backed by subprime mortgage loans.  To make matters worse, State Street applied leverage in making these investments, which had the effect of adding greater risk to the Fund.  These leveraged, high-risk investments exposed the Daily Bond Market Fund to the volatility of the subprime mortgage market at precisely the time when defaults of subprime mortgages were sharply increasing and numerous subprime lenders were facing insolvency.

3.      In addition, State Street and CitiStreet misled Apogee about the time required to exit the Fund.  In early August 2007 – when the Fund was starting to realize large losses – Apogee asked the defendants how long it would take to switch out of the Fund, and was told it would take 60 to 90 days.  In reality, and unbeknownst to Apogee, State Street and CitiStreet were letting plan sponsors exit the Fund on as little as 48 hours' notice.  When Apogee finally learned this fact, it exited the Fund – but only after suffering millions of dollars of losses in just a few weeks in August alone.

4.      By investing in leveraged, high-risk securities, by failing to disclose the change in investment strategy in 2006, and by misrepresenting how long it would take for the Plan to exit the Fund, defendants materially and grievously breached their ERISA fiduciary and other duties to the Plan.  In doing so, the defendants caused the Plan to lose more than **$5 million**.  Apogee brings this action to recover those losses on behalf of the Plan.

## THE PARTIES

5.      Apogee Enterprises, Inc. ("Apogee") is a corporation organized under the laws of the State of Minnesota having its principal place of business in Bloomington, Minnesota.  Apogee provides value-added glass solutions for enclosing commercial buildings and framing art.

6.      The Apogee Enterprises, Inc. 401(k) Retirement Plan (the "401(k) Plan") is an ERISA-governed retirement benefit plan.  Apogee is the sponsor, named fiduciary and plan administrator of the 401(k) Plan.  The 401(k) Plan was formed in 2002 as a result of the merger of the Apogee Enterprises, Inc. Tax Relief Investment Plan (the "TRIP Plan") and the Apogee Enterprises, Inc. Retirement Plan (the "Retirement Plan"), both of which had been in existence since prior to 1999.  The 401(k) Plan, the TRIP Plan and the Retirement Plan are referred to herein collectively as the "Apogee Plan" or the "Plan."

7.      State Street Bank and Trust Company ("SSBT") is a Massachusetts trust company and wholly-owned subsidiary of State Street Corporation.  SSBT has its principal place of business in Boston, Massachusetts.

8.      State Street Global Advisors ("SSgA") is the investment management division of SSBT.  SSgA is also located in Boston, Massachusetts.  SSBT and its division SSgA are referred to herein collectively as "State Street."

9.      SSgA purports to be the world's largest institutional asset manager with over $1.7 trillion in assets under management.  SSgA manages and offers a number of mutual fund and related products, including collective or "commingled" funds for ERISA-governed retirement plans.

10.     At all times material herein, State Street provided trustee, investment management and other fiduciary services, as well as administrative services, to the Plan.

11.     CitiStreet, LLC ("CitiStreet") is a limited liability company having its principal place of business in North Quincy, Massachusetts.  In December of 1999, State Street represented to Apogee that CitiStreet was a "joint venture" formed by Citigroup, Inc. and State Street Corporation.  State Street further represented to Apogee that CitiStreet would be responsible for the delivery of products and services to the Plan and its participants that were previously provided by State Street.

12.     At all times material herein, CitiStreet provided fiduciary and administrative services to the Plan.

13.     In 2008, ING Group acquired CitiStreet, and CitiStreet is now known as ING Institutional Plan Services LLC.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1331 (federal question) and 29 U.S.C. § 1132(e)(1), ERISA § 502(e)(1). This Court further has subject matter jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1332 (diversity) because Apogee, on the one hand, and State Street and CitiStreet, on the other hand, are citizens of different states and the amount in controversy exceeds $75,000.  This Court has supplemental jurisdiction over the pendent state law claims pursuant to 28 U.S.C. § 1367.

15.     Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2) because the Plan is administered in this District, defendants breached their

fiduciary duties in this District, and the defendants are found in this District. Further, venue is proper in this District because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District. 28 U.S.C. § 1391(a)(2) and (b)(2). Finally, venue is proper in this District because State Street and CitiStreet are subject to personal jurisdiction in this District, 28 U.S.C. § 1391(a)(3), and/or can be found in this District. 28 U.S.C. § 1391(b)(3).

## FACTUAL ALLEGATIONS

**I.    The Relationship Of The Parties.**

**A.    State Street served as trustee, administrative services provider and investment manager for the Plan.**

16.    In 1998, Apogee conducted a search for a new trustee, administrative services provider and investment manager for the Plan, and issued a request for proposal ("RFP") to several potential providers, including State Street.

17.    State Street responded to Apogee's RFP by offering to perform all of these services for the Plan. State Street offered these services under the product name "State Street Solutions," which it described as "combin[ing] investment management, communications, trustee, administration, and recordkeeping services in one bundled defined contribution product."

18.    State Street's response to Apogee's RFP described its approach to investment management as including a "[d]isciplined/structured approach to security selection," a "strict adherence to [each investment fund's] investment charter," "consistent returns versus benchmark," and "no surprises."

19.     State Street's response to Apogee's RFP further promised "[c]omprehensive, ongoing communications [which will] keep your company and your employees informed."

20.     Based in part on these representations, Apogee selected State Street to provide the Plan's trustee, plan administration and investment management services effective January 1, 1999.

21.     Apogee and State Street entered into multiple agreements under which State Street agreed to provide those services.

22.     Effective January 1, 1999, State Street and Apogee entered into a "Defined Contribution Plans Master Trust Agreement" (the "Trust Agreement"). Pursuant to the Trust Agreement, State Street Bank agreed to act as trustee for the Plan.

23.     Effective January 1, 1999, State Street and Apogee entered into a "Recordkeeping Services Agreement" (the "Recordkeeping Agreement").  Pursuant to the Recordkeeping Agreement, State Street agreed to provide recordkeeping and plan administrative services, as well as other related services, to Apogee.

24.     Effective January 1, 1999, State Street and Apogee entered into an "Investment Management Agreement."  Pursuant to the Investment Management Agreement, State Street agreed to provide investment management services for certain investment funds the Plan offered to its participants and their beneficiaries, including, but not limited to, the SSgA bond fund which is the subject of this litigation.

25.     As trustee and investment manager for the Plan, State Street was a fiduciary of the Plan within the meaning of 29 U.S.C. § 1002(21)(A) and (38), ERISA § 3(21)(A) and (38).

26.     State Street was also a fiduciary of the Plan as a result of the fact that:  (a) it exercised discretionary authority or discretionary control respecting management of the Plan; (b) it exercised authority or control respecting management or disposition of the Plan's assets; and (c) it had discretionary authority or discretionary responsibility in the administration of the Plan.

**B.     Among the fiduciary duties State Street owed the Plan was the obligation to regularly report to Apogee on the investment performance and strategy of the funds held by the Plan.**

27.     As a fiduciary of the Plan, State Street was obligated to fulfill the fiduciary duties set out in ERISA.  *See* ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1).

28.     Among the fiduciary duties State Street owed the Plan and its participants was the duty to act in accordance with the documents and instruments governing the Plan.  *See* ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).

29.     The Investment Management Agreement and the Plan's Investment Policy Statement constitute "plan documents and instruments governing the plan" within the meaning of ERISA § 404(a)(1)(D).  Accordingly, State Street had a fiduciary duty to comply with the terms of the Investment Management Agreement and the Investment Policy Statement.

30.     Pursuant to the Investment Management Agreement, State Street agreed to "act upon the direction of [Apogee] with respect to the investment of the assets held in the [investment funds managed by State Street]."

31.     Pursuant to the Plan's Investment Policy Statement, State Street, as investment manager, was obligated to provide the Plan's Pension Investment Committee ("PIC") with regular investment reports.  State Street was permitted to provide those reports through its "representatives."

32.     The Investment Policy Statement directed that State Street's investment reports, at a minimum, contain the following information:

- rates of return for the current quarter, year-to-date, 1, 3, 5, 10 years or since inception on a calendar quarter basis within 45 business days of quarter-end;

- asset listings that contain descriptions of all securities held in the portfolio on a semi-annual basis;

- strategy statements or prospectuses that describe the investment strategies currently in place.

33.     The Investment Policy Statement further directed that State Street or one of its representatives provide the Pension Investment Committee with "information relating to any changes in investment philosophy, ownership structure, or financial condition within 30 days of such events."  The investment management reporting obligations described in this Paragraph and in Paragraph 32 above are referred to herein collectively as State Street's "investment reporting obligations."

34.     Apogee furnished State Street and CitiStreet with updated versions of the Plan's Investment Policy Statement throughout the period from 1999 to the present.

-8-

35.     State Street's Retirement Investment Services ("RIS") Group, which was then part of SSgA, State Street's investment management group, performed State Street's investment reporting obligations under the Investment Policy Statement.

36.     By way of example, in early 1999 representatives of State Street's RIS Group presented the PIC with a written presentation entitled "Investment Review" which contained information on the performance and strategy of the Plan's investment funds as of March 1999.

**C.     CitiStreet served as fiduciary and administrative services provider for the Plan.**

37.     In or about December 1999, State Street Corporation and Citigroup, Inc. formed CitiStreet, which they described as a "joint venture."  State Street and CitiStreet represented to Apogee that CitiStreet would be made up, in part, of State Street's Retirement Investment Services Group.  State Street and CitiStreet further represented to Apogee that CitiStreet would be responsible for the delivery of products and services to Apogee previously provided by the RIS Group and that the agreements currently in place between State Street and Apogee would remain effective under the same terms, conditions and fees.

38.     Upon the formation of CitiStreet, CitiStreet began performing plan administrative and fiduciary services for the Plan that had previously been performed by State Street.  Neither State Street nor CitiStreet ever disclosed to Apogee what agreement (if any) existed between them for the provision of these services.  Apogee does not know, for example, whether CitiStreet purported to provide these services as "agent,"

"successor," or "assignee" for State Street.  Apogee does know, however, that its

agreements with State Street for the provision of these services remained in effect after

CitiStreet began performing services previously provided by State Street.  Consequently,

no matter what understanding may have existed between State Street and CitiStreet, State

Street remains legally responsible and liable for all services performed under its

agreements with Apogee, whether those services were performed by State Street and/or

CitiStreet.  CitiStreet, of course, is also responsible and liable for all services it performed

for the Plan.

39.     Among the fiduciary services CitiStreet assumed was performance of State

Street's investment reporting obligations.  Beginning in 2001, CitiStreet attended

meetings of the Apogee Pension Investment Committee on an annual basis.  At those

meetings, CitiStreet provided the same kinds of investment information that the RIS

Group had previously provided.  Specifically, CitiStreet reported on the performance and

strategy of the investment funds held by the Plan.  CitiStreet provided this information to

the PIC both orally and in writing.

40.     By way of example, Marianne Sullivan, a Senior Vice President of

CitiStreet, attended the PIC meeting held on May 11, 2001.  CitiStreet described

Ms. Sullivan as its "relationship manager in regards to investment funds in large to mid-

sized defined contribution plan clients" and as its "investment contact for Apogee."

CitiStreet identified a different CitiStreet employee, John Kamp, as the "Recordkeeping

and Relationship Manager" for Apogee.

41.     At the May 11, 2001 meeting, Ms. Sullivan reviewed the investment

performance and strategy of the Plan's funds for the quarter ended March 31, 2001.  She also presented the SSgA U.S. Large Cap Growth Opportunities Fund as an alternative to the SSgA Large Cap Growth Strategy Fund, the Plan's then-current large cap growth fund offering.  Ms. Sullivan described the strategy of the SSgA U.S. Large Cap Growth Opportunities Fund as involving a more fundamental, active management approach, and one that is not "growth at all cost," but rather as having a more defensive style.

42.     At the August 16, 2002 meeting of the PIC, Marianne Sullivan reviewed the investment performance and strategy of the Plan's funds for the quarter ended June 30, 2002.  Among other things, Ms. Sullivan discussed the underperformance of the SSgA International Fund and her view that the underperformance did not have anything to do with a change in investment style by SSgA.  The minutes of the PIC meeting that day summarize Ms. Sullivan's discussion on the topic:

> Ms. Sullivan indicated that the SSgA International Fund focuses on a team approach.  It does not rely on an individual manager.  Ms. Sullivan indicated that the recent underperformance is not due to the change in the portfolio  manager.  Rather, Ms. Sullivan indicated that the recent underperformance relates primarily to the funds [sic] focus on large cap growth stocks. Ms. Sullivan indicated that the style of the fund had not changed; the fund is sticking with its mandate to focus on large cap growth stocks.  Therefore, over an entire investment/economic cycle, the fund's performance should be more in line with its benchmark.

43.     As alleged in Paragraphs 74 through 103 below, CitiStreet assumed authority or control over the management or disposition of the Plan's assets in August of 2007, and became a fiduciary of the Plan as a result.

44.     CitiStreet was a fiduciary of the Plan as a result of the fact that (a) it exercised discretionary authority or discretionary control respecting management of the

Plan; (b) it exercised authority or control respecting management or disposition of the Plan's assets; and (c) it had discretionary authority or discretionary responsibility in the administration of the Plan.

## II.    State Street And CitiStreet Repeatedly Represented That The Daily Bond Market Fund Was A "Conservative," "Stable," "Risk-Controlled," And "Well-Diversified" "Enhanced Bond Index Fund."

45.    As part of its 1998 RFP, Apogee asked State Street to recommend a bond fund to serve as the core fixed income investment component of the Plan.  After initially proposing a bond fund Apogee rejected, State Street recommended a fund it called the "Daily Bond Market Fund Series A."  This is the name State Street gave to the fund in the Investment Management Agreement.  Subsequently, however, State Street and CitiStreet referred to the fund by various other names, including the following:  (a) "Daily Bond Market Fund;" (b) "Apogee Bond Fund;" (c) "Bond Fund;" (d) "SSgA Bond Market Fund Series A;" (e) "Bond Market Series A;" (f) "SSgA Bond Market Fund (CMB1);" (g) "SSgA Core Aggregate Strategy – Daily Bond Market;" (h) "Bond Market Non-Lending Series Fund;" (i) "Bond Market Non-Lending Series Fund Class A;" and (j) "Bond Market NL Series Fund Class A."  For clarity and convenience, the SSgA bond fund State Street recommended to Apogee, and which Apogee invested Plan assets in based upon that recommendation, is referred to herein as the "Daily Bond Market Fund" or the "Fund."

46.    In its 1998 RFP, Apogee also asked State Street to recommend a bond fund to serve as the fixed income investment component of its non-core allocation funds, which Apogee refers to as the Plan's "Strategy Funds."  State Street ultimately

recommended the Daily Bond Market Fund.  As a result of State Street's

recommendation, Apogee selected the Daily Bond Market Fund to serve this purpose and

set the following allocation percentages for the Daily Bond Market Fund in each Strategy

Fund:  (a) 45% in the Conservative Strategy Fund; (b) 30% in the Moderate Strategy

Fund; and (c) 15% in the Aggressive Strategy Fund.

47.    At all times material herein, State Street and CitiStreet represented to

Apogee and the participants of its Plan that the Daily Bond Market Fund was a

"conservative," "stable," "risk-controlled," and "well-diversified" "enhanced bond index

fund."

48.    For example, in the Spring of 1999, State Street's RIS Group presented an

"Investment Review" of the SSgA funds Apogee had recently selected based on State

Street's recommendations.  In it, State Street described the Daily Bond Market Fund this

way:

**Investment Strategy**

SSgA employs an ***enhanced bond indexing strategy*** that seeks to add incremental
value over the [Lehman Brothers Aggregate Bond] index.  The Fund invests in a
***diversified portfolio*** of investment grade fixed income securities that primarily
include U.S. Treasury, agency, corporate and asset-backed securities.  The Fund
does not take duration risk, remaining duration neutral to the benchmark at all
times and does not employ interest rate forecasting in the Fund.  Returns are
enhanced through ***a structured, risk controlled process*** that seeks to add
incremental value through sector and security selection and opportunistic trading.

**Investment Objective**

SSgA seeks to provide attractive returns while ***controlling risk*** by investing in
high quality bonds in the Daily Bond Market Fund.  The performance objective is
to match or exceed the returns of the Lehman Brothers Aggregate Bond Index.
(Emphasis added.)

49.     State Street periodically prepared a "Fund Fact Sheet" that described the Daily Bond Market Fund for Apogee and Plan participants.  That Fund Fact Sheet consistently represented that the Daily Bond Market Fund was appropriate for Plan participants seeking to "***add stability of principal***" to their portfolio:

> **Is the Fund Appropriate for Me?**  In building a retirement portfolio, it's important to include a mix of equity (stock) and fixed income (bond) funds.  Stock funds help build the value of your portfolio over the long term, while bond funds provide income and *stability of principal*.  As a bond fund, this fund may be appropriate if you have a short to medium investment time frame or if you are looking to generate income and ***add stability of principal*** to your portfolio as you near retirement.  (Emphasis added.)

50.     The Fund Fact Sheet State Street prepared for the Apogee Conservative Strategy Fund – the allocation fund holding 45% of its assets in the Daily Bond Market Fund – repeatedly told Apogee and the participants in the Plan that it was "***somewhat conservative*** due to its emphasis on bond holdings."  (Emphasis added.)

51.     On May 11, 2001, CitiStreet made a presentation to the Apogee Pension Investment Committee regarding the Plan's SSgA fund investments.  In its written materials, CitiStreet described the Daily Bond Market Fund as "seek[ing] to provide attractive returns while ***controlling risk***."  (Emphasis added.)

52.     In 2004, State Street and CitiStreet provided Apogee with additional information describing SSgA's "Core Aggregate Strategy," of which the Daily Bond Market Fund was a component.  That information described the Core Aggregate Strategy as follows:

> Ÿ     "The Core Aggregate Strategy seeks to provide attractive returns while ***controlling risk***."

Ÿ    The Core Aggregate Strategy employs a "***risk controlled approach***" where "***[r]isk is monitored daily*** by portfolio managers, credit analysts, and traders."

Ÿ    "The success of our core strategies lies in our ability to ***incorporate risk-controlled quantitative analysis with qualitative methods***."

Ÿ    "Like all of the fixed income strategies at SSgA, our Core process is characterized by its ***benchmark orientation*** and its consistency (defined here as ***low volatility of returns versus a benchmark***)."

Ÿ    "Additionally, we utilize ***low risk strategies*** where we perceive there to be market inefficiencies and where we can take advantage of these inefficiencies through our unique fund structure utilizing, among other things, our expertise in passive bond and cash management.  Success of our Core Strategies lies in our ability to ***incorporate fundamental, qualitative methods with risk controlled quantitative analysis*** using proprietary risk models as well as vendor models."  (Emphasis added.)

53.    Apogee and the Plan participants relied on these representations by State Street and CitiStreet in continuing to invest Plan assets in the Daily Bond Market Fund.

**III.    State Street Changes The Strategy Of The Daily Bond Market Fund, Sharply Reducing Its Diversification And Substantially Increasing Its Risk Profile.**

54.    While these representations by State Street and CitiStreet may have been true at some earlier point in time, they certainly were no longer true by 2007, when the Fund suffered substantial losses.  By that time, the Daily Bond Market Fund was not "conservative," "stable," "risk-controlled," or "well-diversified."  Indeed, by 2007, State Street had changed the strategy of the Daily Bond Market Fund from one of an enhanced bond index fund to one of a leveraged, high-risk fixed income fund.

55.    State Street changed the strategy of the Daily Bond Market Fund by investing ever greater amounts of the Fund's assets in high-risk securities, including

securities backed by subprime mortgage loans.  To make matters worse, State Street applied leverage in making these investments, which had the effect of adding greater risk to the Fund.

56.     These leveraged, high-risk investments exposed the Daily Bond Market Fund to the volatility of the subprime mortgage market at precisely the time when defaults of subprime mortgages were sharply increasing and when numerous subprime lenders were facing insolvency.

57.     "Subprime" mortgage loans are loans with unconventional terms, such as discounted "teaser" interest rates, an inordinately high loan to equity ratio or an extended period for repayment, as well as loans made to borrowers with low income and/or poor credit history who do not qualify for standard ("prime") mortgage loan terms.  To create liquidity for these subprime mortgages, lenders combine them with other asset-backed securities to form a "collateralized debt obligation" or "CDO."  Tranches of the CDOs are then sold to investors, who are entitled to the cash flow from the bundled monthly mortgage payments (principal and/or interest) paid by the mortgage borrowers.  This type of bundling increases funding to the lenders by reducing risk – through the pooling of the loans – and also results in the transfer of risk to investors that are willing to purchase these securities.

## IV.   State Street's Change In Strategy Leads To Massive Losses In The Daily Bond Market Fund – And, Consequently, In Apogee Plan Assets – In 2007.

58.     In 2005 and 2006, the Federal Reserve Bank instituted a series of interest rate hikes, and the interest rates on variable rate loans, including mortgage loans, began

to rise.  Subprime borrowers who were able to afford the initially low "teaser rate" loan payments could no longer meet their monthly payment obligations.  At the same time, home values began to decline (with particularly sharp declines experienced in various parts of the country), leading many borrowers to walk away from loans when they could neither afford their increasing monthly mortgage payments nor re-sell their property for a profit.  As a result, many borrowers (and in particular subprime borrowers) stopped making payments on their mortgages, causing mortgage defaults to increase dramatically. The widespread failure of the subprime mortgages that underlie CDOs and other asset-backed and mortgage-backed securities significantly impaired the value of those securities.

59.  The imminent collapse of the subprime lending industry was widely documented.  In December 2006, the Center for Responsible Lending issued a report predicting the worst foreclosure crisis in the modern mortgage market.  *See* Ron Nixon, *Study Predicts Foreclosure For 1 In 5 Subprime Loans,* New York Times (December 20, 2006).  Shortly thereafter, several major mortgage lenders disclosed extraordinary rates of loan defaults, triggering inquiries from the SEC and FDIC, and resulting in several bankruptcy filings by mortgage lenders.  In this financial environment, State Street exposed the investors in the Daily Bond Market Fund to inordinate and unacceptable risk by investing large amounts of the Daily Bond Market Fund's assets in such securities and instruments, and caused losses that would not have occurred had State Street managed the Fund as it had represented.

60.    The subsequent collapse of the subprime lending industry – which was in full swing in 2007 – simply confirmed that securities and derivative instruments backed by subprime mortgage loans were highly risky and not suitable for the Daily Bond Market Fund.  Indeed, on March 13, 2007, the Mortgage Bankers Association announced that during the fourth quarter of 2006, U.S. subprime borrowers fell behind in their mortgages at the highest rate in over four years – up nearly a point from the previous quarter – and that foreclosures had jumped to an all-time high.

61.    In information provided to Apogee by State Street and CitiStreet *after* the collapse in the subprime mortgage market (and then only *after* Apogee demanded the information), State Street and CitiStreet admitted the following:

(a)    As of July 31, 2007, fully **27.29%** of the Daily Bond Market Fund's assets (when measured on a notional value basis) were invested in home equity asset-backed securities.  As of that same date, only **0.23%** of the assets comprising the Fund's benchmark (the Lehman Brothers Aggregate Bond Index) were held in such securities.  (As of March 31, 2005, before State Street changed its investment strategy, only **1.58%** of the Fund's assets were invested in any kind of asset-backed security.)

(b)    The Daily Bond Market Fund was using leveraging – meaning it was investing in securities with a risk exposure far greater than the value of the Fund's investment in those securities.  This leverage took the form of investments in derivative securities and/or securities purchased with short-term borrowings whose underlying assets primarily consisted of subprime mortgage loans.  By using

-18-

leverage in this way, State Street sharply increased its exposure to the substantial risk already posed by these investments.

State Street and CitiStreet have never adequately answered Apogee's questions regarding State Street's change in investment strategy, use of leverage, or investment in securities backed by subprime mortgage loans.

62.     The losses sustained by the Daily Bond Market Fund in 2007 were enormous.  During the period from January 1, 2007 to August 24, 2007 (six days before the Plan finally exited the Fund), the Daily Bond Market Fund lost **20.86%** of its value, as reported by State Street.  During that same period, the Lehman Brothers Aggregate Bond Index – the benchmark by which State Street itself measured the Fund's performance – had increased **2.72%**, as reported by State Street.  Consequently, when measured against its benchmark, the Fund lost fully **23.58%** of its value during this period.

63.     Apogee estimates that the Plan and its participants lost approximately **$4.4 million** in 2007 as a result of the losses sustained in the Daily Bond Market Fund. This estimate includes losses incurred in the Plan's core bond fund component and in the bond fund components of its three Strategy Funds.  Apogee further estimates that the Plan and its participants lost over **$5 million** when the Fund's performance is measured against its benchmark, the Lehman Brothers Aggregate Bond Index.

64.     In a communication dated August 20, 2007, State Street for the first time began to explain what had happened to Plan participants:

Beginning in late 2006 and continuing into 2007, delinquencies on subprime mortgage loans increased as credit-blemished borrowers began to struggle to make payments as their mortgage loans reset at higher rates.  As a result, a rash of subprime mortgage foreclosures occurred and several major subprime mortgage lenders filed for bankruptcy. . . . A combination of thin volume and hedge fund shorting activity led to illiquidity and extreme market volatility in securities and other financial instruments based upon the ABX [subprime mortgage] indices.

The subprime mortgage market further deteriorated in June and July of this year . . . .  In July, the downgrading and watch-listing by Moody's and Standard and Poor's of securities secured by subprime mortgages triggered a significant and sustained unwinding of leverage and sale of securities. . . .

We believe that what has occurred in the subprime mortgage market to date this year has been more driven by liquidity and leverage issues than long term fundamentals.  Additionally, the downdraft in valuation has had a significant impact on the risk profile of the Bond Fund prompting us to take steps to seek to reduce risk.

65.    In its January 2008 Form 8-K filing, State Street was forced to admit even

more about what had occurred:

> Among other things, the portfolio managers for certain actively managed fixed-income strategies materially increased the exposure of these strategies to securities backed by sub-prime mortgages and shifted the weighting of these portfolios to more highly rated sub-prime instruments.  During the third quarter of 2007, as the liquidity and valuations of these securities, including the more highly rated instruments, came under increased pressure, the performance of these strategies was adversely affected, in some cases significantly.  The underperformance, which was greater than that typically associated with fixed-income funds, also caused a number of our customers to question whether the execution of these strategies was consistent with their investment intent.  This has resulted in several civil suits, including putative class action claims.  These lawsuits allege, among other things, that we failed to comply with our standard of care in managing these active funds as a fiduciary under ERISA.  We have also received inquiries from regulatory authorities regarding SSgA's active fixed-income strategies.  Given our desire to fully respond to customer concerns, following the end of the third quarter of 2007, State Street undertook a further review of all the actively managed fixed-income strategies at SSgA that were exposed

to sub-prime investments.  Based on our review and on-going discussions with customers who were invested in these strategies, we established the reserve to address our estimated legal exposure.

66.     On January 3, 2008, State Street announced the resignation of William W. Hunt, then President and Chief Executive Officer of SSgA.

67.     State Street reportedly also "terminated" six senior members of SSgA's fixed income team.

68.     Shortly after cleaning house, State Street established a $618 million litigation reserve to cover its anticipated legal exposure.

## V.     State Street And CitiStreet Violate The Plan's Investment Policy Statement By Failing To Disclose The Change In The Fund's Investment Strategy.

69.     In 2003, State Street announced major personnel changes in its Global Fixed Income Team and U.S. Core Fixed Income Team, the groups within State Street which had responsibility for the management of the Daily Bond Market Fund. Specifically, State Street announced that Sean Flannery had assumed responsibility for the Global Fixed Income Team, replacing Vic Thompson (who left the company), and Michael Wands had assumed responsibility for the U.S. Core Fixed Income Team, replacing Joe Marvan (who also left the company).

70.     As a result of those personnel changes, Apogee asked the Plan's investment advisor at that time, Ernst & Young ("E&Y"), to inquire of State Street whether there would be any change in the investment strategy of the Daily Bond Market Fund.  State Street represented to E&Y that there would be no change to its strategy, philosophy or

processes as a result of these personnel changes.  Based upon that representation, Apogee decided to continue the Plan's investment in the Daily Bond Market Fund.

71.     Contrary to State Street's representation, the strategy of the Daily Bond Market Fund did, in fact, change after these personnel changes.  It was under the leadership of Mr. Flannery and Mr. Wands that the investment strategy of the Daily Bond Market Fund changed to one focused on acquiring leveraged, high-risk securities, including securities backed by subprime mortgage loans.  Indeed, Mr. Flannery and Mr. Wands were two of the top executives to depart State Street after State Street's fixed income strategies failed in 2007, along with the subprime mortgage market.

72.     Contrary to their obligations under the Plan's Investment Policy Statement, neither State Street nor CitiStreet ever advised Apogee of State Street's change in investment strategy for the Daily Bond Market Fund until just a few days before Apogee decided to exit the Fund on August 28, 2007.

73.     State Street's and CitiStreet's breach of their obligations under the Plan's Investment Policy Statement caused the Plan to suffer millions of dollars in losses.

## VI.     State Street And CitiStreet Make Material Misrepresentations About Apogee's Ability To Withdraw From The Daily Bond Market Fund.

74.     Throughout 2007, Apogee was tracking the performance of the Daily Market Bond Fund, and grew concerned in mid-2007 with the Fund's underperformance.

75.     In early June 2007, for example, Apogee's Gary Johnson (a member of Apogee's Pension Investment Committee) noted that the Daily Market Bond Fund's one-year ranking had gone from 45 to 73, and communicated his concern about this in an

e-mail to Shannon King at SilverOak Wealth Management (which had been, at the time, helping to advise Apogee on its retirement investments).

76.     Apogee's concerns continued to grow when, on July 31, 2007, CitiStreet's Kevin McGrath e-mailed a letter to Apogee, advising Apogee that certain events – problems in the subprime market, downgrading of various securities, and mortgage payment delinquencies and foreclosures – had "impact[ed] performance in some of our active fixed income portfolios in which you are invested directly or indirectly."

77.     Immediately upon receiving CitiStreet's letter, Apogee's Johnson forwarded the letter to King at SilverOak.  Johnson asked King whether he had "noticed a significant decline in the value of" the Daily Bond Market Fund, and whether there was any action Apogee should take.

78.     King responded in early August, informing Johnson that one of SilverOak's analysts had spoken with CitiStreet and had learned that the Fund lost approximately 3% to 4% in July.  King also told Johnson that SilverOak was trying to coordinate a call with State Street, and promised to get back to Johnson when he had more information.

79.     Upon information and belief, SilverOak continued thereafter to press both CitiStreet and State Street for information regarding the Fund's performance.  SilverOak also advised CitiStreet that its client (Apogee) was quite concerned about the Fund's underperformance, stating in an August 6, 2007, e-mail to Kevin McGrath that "the negative performance will most likely bring some questions at our upcoming investment committee meeting."

80.     On or about Thursday, August 9, 2007, SilverOak had a conference call with CitiStreet's Kevin McGrath and State Street's Jim Hopkins to discuss the performance and strategy of the Fund.  Upon information and belief, SilverOak was told during this call that the negative performance in the Fund had come primarily from investments in subprime mortgage securities.  CitiStreet and State Street also reported in this call that the shift in the performance of the Fund began in July, with a 4.3% loss. State Street's Hopkins stated that both volatility and lack of liquidity were continuing to hamper the Fund in August, and that the Fund was down approximately 2% to 3% through the first eight days of the month.

81.     Apogee understands that during this August 9 phone conference, SilverOak also asked CitiStreet and State Street how long it would take to transition Apogee out of the Fund, if Apogee were to decide to do so.  CitiStreet's McGrath stated it would take 60 to 90 days to exit the Fund.

82.     SilverOak's King summarized the August 9 phone call in an e-mail to Apogee's Johnson sent on Friday, August 10.  In that e-mail, King recommended to Johnson that Apogee discuss the Fund's performance at a previously scheduled September 14 meeting.

83.     After receiving King's August 10 e-mail, Johnson immediately communicated with other members of Apogee's Pension Investment Committee, and recommended scheduling a special session of the PIC to discuss the Fund's performance. A special session of the PIC was set for Monday, August 13, 2007.

84.     At the PIC meeting that took place on August 13 – which was called specifically to discuss the recent performance of the Fund – Johnson reported to the PIC that State Street had notified Apogee by e-mail dated July 31, 2007, that problems in the subprime mortgage market had adversely impacted the performance of some of Apogee's fixed income portfolios.  Johnson further reported that the Fund lost approximately 3% to 4% percent in July, a loss that Johnson noted was "huge."

85.     Also at this August 13 meeting, SilverOak's King advised the PIC about his August 9 phone conference with CitiStreet and State Street.  Specifically, King informed the PIC that he was told in that phone call that it would take 60 to 90 days to exit the Fund, if Apogee wished to do so.

86.     The PIC was concerned with the July performance and the anticipated August performance of the Fund.  But, based on the representations of State Street and CitiStreet, the PIC decided at the August 13 meeting to remain in the Fund, while monitoring it closely.

87.     Then, on August 21, SilverOak spoke again to CitiStreet and State Street and learned that the Fund's assets had dropped from $292 million to $160 million.  Apogee understands that CitiStreet and State Street declined to provide details during this call to explain this fall in assets.

88.     SilverOak and CitiStreet then corresponded again on August 23 about a phone conference set to take place on Friday, August 24.  SilverOak's Shannon King and John Foster, and State Street's Jim Hopkins, participated in the August 24 call.

89.     Upon information and belief, SilverOak discussed again during this August 24 call the recent significant drop in assets in the Fund (which, at that point, had dropped to $155 million).  State Street's Hopkins revealed for the first time during this call that the significant losses in the Fund were due, in part, to the Fund's use of leverage. SilverOak also learned during the August 24 phone call that the drop in assets was due in further part to other plan sponsors exiting the Fund.  Indeed, Hopkins stated during the August 24 phone call that plan sponsors were being allowed out of the Fund within two to three days.

90.     After the August 24 phone conference, State Street sent a letter to Apogee dated Monday, August 27, 2007, that set out information on the Fund as of August 24, 2007.  The letter indicated that the Fund was 17.33% below the Lehmann Brothers Aggregate Bond Index month-to-date.  The letter also disclosed the returns of the Apogee Conservative Strategy Fund, Moderate Strategy Fund, and Aggressive Strategy Fund, and noted that all were below their benchmarks.  Finally, the August 27 letter disclosed that there were only 11 participants remaining in the Fund (four of which, it turned out, were the four funds in the Apogee 401(k) Plan that were invested in the Daily Bond Market Fund), and that the Fund had a value of approximately $139 million.

91.     After reading the August 27 letter, SilverOak's King had a follow-up phone call with CitiStreet's Kevin McGrath, and asked him again how long it would take for a plan sponsor to exit the Fund.  McGrath initially repeated that it would take 60 to 90 days, but then subsequently told King that CitiStreet could let a plan sponsor out on as little as 48 hours' notice.

92.     Apogee, upon receiving the August 27 State Street letter, called an emergency meeting of the PIC, which took place on Tuesday, August 28, 2007.

93.     At the August 28 meeting, SilverOak's King reported to the PIC on the conversations he had had with CitiStreet and State Street.  Specifically, King advised the PIC that the significant and rapid decline in the Daily Bond Market Fund's assets was due, in part, to the Fund's previously undisclosed use of leverage, and in part to other plan sponsors being allowed to leave the Fund on as little as 48 hours' notice.

94.     Having learned that State Street's and CitiStreet's past representations were not true, the PIC decided to move from the actively-managed Daily Bond Market Fund to a passive bond index fund as soon as possible.

95.     Consistent with the PIC's decision to exit the Fund, Apogee's Gary Johnson e-mailed CitiStreet's Kevin McGrath on August 28, and asked to set up a conference call the following day.

96.     On August 30, 2007, Apogee communicated to its Plan participants that it would be moving from the Daily Bond Market Fund to a passive bond index fund.

97.     Between August 9, 2007 – when SilverOak was first informed that it would take 60 to 90 days to exit the Daily Bond Market Fund – and August 30, 2007, when Apogee was finally allowed to exit the Daily Bond Market Fund, the value of the Fund (and of the Plan's investment in the Fund) dropped sharply.

98.     Indeed, State Street itself concedes that these weeks in August were pivotal in terms of measuring the performance of its bond funds, and acknowledges that a

significant portion of the losses investors in the bond funds realized came during these weeks.

99.     As State Street alleged in a counterclaim filed recently in the Southern District of New York, those plan sponsors that did not exit State Street's bond funds in late July or early August 2007 saw "significant additional losses to their plans in the third quarter of 2007."

100.    The same is true for Apogee.  Apogee estimates that the Fund dropped approximately **12.5%** in value between August 9 and August 30, 2007.  Apogee further estimates that this **12.5%** drop in value equates to an approximately **$2.9 million** loss for the Apogee 401(k) Plan.  These losses do not account for how the Fund performed compared to its index.  By that comparison, the losses the Plan incurred during the time period that it was laboring under incorrect information regarding the time it would take to exit the Fund were even greater.

101.    Apogee, unlike other plan sponsors invested in State Street's bond funds, was not advised to exit the Fund in late July or early August 2007, but was instead (as a result of CitiStreet's and State Street's misrepresentations regarding the length of time it would take to exit the Fund) actively discouraged from leaving the Fund when it first inquired into the timing of an exit.

102.    As State Street alleged in the counterclaim filed recently in the Southern District of New York, a State Street representative allegedly communicated with an unnamed plan sponsor on July 31, 2007, and advised that sponsor to move from State Street's Intermediate Bond Fund to a passive investment option "as soon as possible."

103.    State Street did not treat Apogee equally.  State Street did not encourage Apogee to leave the Daily Bond Market Fund as soon as possible, nor did it even disclose to Apogee that it had encouraged other plan sponsors to exit other State Street bond funds as soon as possible.  Rather, State Street and CitiStreet went entirely in the other direction in their communications with Apogee, making representations about the timing of an exit from the Fund that were calculated to (and did) delay Apogee's move out of the Fund – during a period when losses in State Street's bond funds were mounting daily.

## APPLICABLE LAW

104.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), provides, in pertinent part, that a civil action for breach of fiduciary duty may be brought by the Secretary of Labor, or a participant, beneficiary or fiduciary of a plan, for relief under ERISA § 409, 29 U.S.C. § 1109.

105.    ERISA § 409(a), 29 U.S.C. § 1109(a), entitled "Liability for Breach of Fiduciary Duty," provides, in pertinent part,

> any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

106.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant, beneficiary and fiduciary to seek equitable relief from defendants, including, without

limitation, injunctive relief and, as available under applicable law, a constructive trust, restitution, and other monetary relief.

107.    ERISA §§ 404(a)(1)(A), (B), (C) and (D), 29 U.S.C. §§ 1104(a)(1)(A), (B), (C) and (D), provide, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries; for the exclusive purpose of providing benefits to participants and their beneficiaries; with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims; by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of Titles I and IV of ERISA.

108.    These fiduciary duties under ERISA §§ 404(a)(1)(A), (B), (C) and (D) are referred to as the duties of loyalty, exclusive purpose, prudence, diversification, and compliance with plan documents.

109.    As described herein, State Street and CitiStreet breached these ERISA fiduciary duties.

110.    Apogee therefore brings this action under ERISA §§ 502(a)(2) and 502(a)(3), for relief under ERISA § 409(a) to recover losses sustained by the Plan arising out of State Street's and CitiStreet's breaches of fiduciary duties in violation of ERISA § 404(a)(1).

111.    With respect to calculation of the losses to the Daily Bond Market Fund,
breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary
duty, the Plan would not have made or maintained its investments in the challenged
investment and, instead, prudent fiduciaries would have invested the Plan's assets
prudently and appropriately, and in this instance, according to the represented strategy of
the Daily Bond Market Fund.  In this way, the remedy restores the Plan's lost value and
puts the participants in the position they would have been in if State Street and CitiStreet
had not breached their fiduciary duties.

### ERISA § 404(c) DEFENSE IS NOT APPLICABLE IN THIS CASE

112.    ERISA § 404(c) is an affirmative defense that provides a limited exception
to fiduciary liability for losses that result from participants' exercise of control over
investment decisions in ERISA-governed retirement plans.  For § 404(c) to apply,
participants must in fact exercise "independent control" over investment decisions, and
the fiduciaries must otherwise satisfy the numerous procedural and substantive
requirements of ERISA § 404(c), 29 U.S.C. § 1104(c), and the regulations promulgated
under it.

113.    ERISA § 404(c) does not apply here for several reasons.  First, ERISA
§ 404(c) does not and cannot provide a defense to State Street's decision to implement
and maintain an imprudent investment strategy for the Daily Bond Market Fund, as these
were not decisions that were made or controlled by Plan participants.  Rather, State Street
exclusively controlled how the assets in the Daily Bond Market Fund were invested.

114.    Second, ERISA § 404(c) does not apply because State Street and CitiStreet failed to ensure effective participant control by failing to provide complete and accurate material information to the Plan's participants regarding the manner in which State Street managed the Daily Bond Market Fund.  State Street and CitiStreet represented to Apogee and Plan participants that the Fund was a "conservative," "stable," "risk controlled," "well-diversified," "enhanced bond index fund."  In fact, State Street invested the Fund's assets in leveraged, high-risk securities.  As a consequence, participants did not have informed control over the portion of their assets that were invested in the Fund as a result of their investment directions, and State Street remained entirely responsible for losses that resulted from such investment.

115.    Because ERISA § 404(c) does not apply here, State Street's and CitiStreet's liability to the Plan and its participants for losses caused by the Daily Bond Market Fund's undisclosed, risky investment strategies is established upon proof that such investments were or became imprudent and resulted in losses in the value of the assets in the Plan.

## CLAIMS FOR RELIEF

### COUNT ONE
**(Breach Of ERISA Fiduciary Duty To Disclose Regarding Change In Strategy –
State Street And CitiStreet)**

116.    Apogee incorporates the allegations set forth in paragraphs 1 to 115 as if fully set forth herein.

117.    Despite regular communications with Apogee to review the performance and strategies of the Plan's fund offerings, neither State Street nor CitiStreet ever disclosed that

the investment strategy and risk profile of the Daily Bond Market Fund had materially changed and that the Fund was no longer a suitable investment option for the Plan and its participants.  Specifically, and without limitation, State Street and CitiStreet failed to disclose to Apogee and the Plan's participants that beginning in or about 2006:

(a)     The Daily Bond Market Fund was no longer a "conservative," "stable," "risk-controlled," and "well-diversified" "enhanced index bond fund."

(b)     State Street had undertaken an investment strategy for the Daily Bond Market Fund which involved substantial investment in high-risk securities, including securities backed by subprime mortgage loans.

(c )    State Street was using large amounts of leverage in the Daily Bond Market Fund that exposed the Fund to even greater risk.  This leverage resulted primarily from State Street's investment in derivative securities and/or securities purchased with short-term borrowings which were backed by subprime mortgage loans.

118.    State Street and CitiStreet had a duty under the Plan's Investment Policy Statement to disclose this information to Apogee and the Plan's participants.

119.    State Street and CitiStreet had a fiduciary duty under ERISA to disclose this information to Apogee and the Plan's participants.

120.    State Street and CitiStreet breached their respective fiduciary duties by failing to disclose this information to Apogee until, at the very earliest, only a few days before Apogee exited the Fund.

121.    Based on the representations State Street and CitiStreet made about the Daily Bond Market Fund and based on the Fund's previous satisfactory performance, neither Apogee nor Plan participants had any reason to question the advisability of inclusion of the Fund in the Plan.

122.    State Street and CitiStreet also breached their respective duties as co-fiduciaries under ERISA § 405(a) by, among other things and without limitation,  (i) knowingly participating in, or knowingly undertaking affirmative actions or omissions to conceal, each other's breaches of fiduciary duty; (ii) enabling each other to commit a fiduciary breach by breaching its own fiduciary duties; and/or (iii) failing to make reasonable efforts under the circumstances described above to correct each other's breaches of fiduciary duty, despite the fact that each knew or should have known about the other's fiduciary breaches.

123.    As a consequence of State Street's and CitiStreet's breaches of fiduciary duty, the Plan and its participants suffered millions of dollars in losses.

124.    State Street and CitiStreet are liable for these losses because they were caused by their breaches of fiduciary duty.

125.    Apogee, on behalf of the Plan, is therefore entitled to relief from State Street and CitiStreet in the form of:  (a) a monetary payment to the Apogee Plan to make good to the Plan the losses resulting from the breaches of fiduciary duty alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (b) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a), 502(a)(2)

and (3), 29 U.S.C. §§ 1109(a), 1132(a)(2) and (3); (c) injunctive and other appropriate

equitable relief pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), to the extent

applicable for knowing participation by a non-fiduciary in a fiduciary breach;

(d) reasonable attorneys' fees and expenses, as provided by ERISA § 502(g), 29 U.S.C.

§ 1132(g), and other applicable law; (e) taxable costs and interest on these amounts, as

provided by law; and (f) such other legal or equitable relief as may be just and proper.

## COUNT TWO
### (Breach Of ERISA Fiduciary Duty To Disclose Regarding Exiting From The Fund – State Street And CitiStreet)

126.    Apogee incorporates the allegations set forth in paragraphs 1 to 125 as if

fully set forth herein.

127.    Apogee, through its investment advisor SilverOak, expressly asked during

an August 9, 2007, phone call with State Street and CitiStreet how long it would take to

exit the Fund, if Apogee wished to do so.  CitiStreet stated it would take 60 to 90 days,

and neither CitiStreet's nor State Street's representatives on this call informed SilverOak

that other plan sponsor investors were being allowed to exit the Fund on a much shorter

time table.

128.    Indeed, at no point between August 9 and August 24 (when Hopkins

revealed to SilverOak that some plan sponsors had exited the Fund within two to three

days) did State Street contact either SilverOak or Apogee to advise them that the 60- to

90-day timeframe discussed in the August 9 phone call was inaccurate.

129.    Similarly, at no point between August 9 and August 27 (when McGrath

admitted to SilverOak that plan sponsors were being allowed out of the Fund with as little

as 48 hours' notice) did CitiStreet contact either SilverOak or Apogee to advise them that

the 60- to 90-day timeframe discussed in the August 9 phone call was inaccurate.

130.    State Street and CitiStreet had a fiduciary duty under ERISA to disclose this

information to Apogee.

131.    State Street and CitiStreet breached their respective fiduciary duties by

failing to disclose this information to Apogee.

132.    Based on the representations State Street and CitiStreet had made about the

time it would take to exit the Daily Bond Market Fund, Apogee had no reason to question

the statement that it would take 60 to 90 days to exit the Fund.

133.    Based on the representations of State Street and CitiStreet, Apogee elected

to stay in the Fund during August 2007 – at a time when, unbeknownst to Apogee, other

plan sponsors were streaming out of the Fund.

134.    State Street and CitiStreet also breached their respective duties as co-

fiduciaries under ERISA § 405(a) by, among other things and without limitation,  (i)

knowingly participating in, or knowingly undertaking affirmative actions or omissions to

conceal, each other's breaches of fiduciary duty; (ii) enabling each other to commit a

fiduciary breach by breaching its own fiduciary duties; and/or (iii) failing to make

reasonable efforts under the circumstances described above to correct each other's

breaches of fiduciary duty, despite the fact that each knew or should have known about

the other's fiduciary breaches.

135.    As a consequence of State Street's and CitiStreet's breaches of fiduciary

duty, the Plan and its participants suffered millions of dollars in losses.

136.    State Street and CitiStreet are liable for these losses because they were caused by their breaches of fiduciary duty.

137.    Apogee, on behalf of the Plan, is therefore entitled to relief from State Street and CitiStreet in the form of: (a) a monetary payment to the Apogee Plan to make good to the Plan the losses resulting from the breaches of fiduciary duty alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (b) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a), 502(a)(2) and (3), 29 U.S.C. §§ 1109(a), 1132(a)(2) and (3); (c) injunctive and other appropriate equitable relief pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), to the extent applicable for knowing participation by a non-fiduciary in a fiduciary breach; (d) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), and other applicable law; (e) taxable costs and interest on these amounts, as provided by law; and (f) such other legal or equitable relief as may be just and proper.

## COUNT THREE
### (Breach of ERISA Fiduciary Duties Regarding Management Of Fund Assets – State Street)

138.    Apogee incorporates the allegations set forth in paragraphs 1 to 137 as if fully set forth herein.

139.    As trustee, investment manager and fiduciary under ERISA, State Street was obligated to discharge its ERISA duties of loyalty, exclusive purpose, prudence, diversification and compliance with plan documents.  ERISA § 404(a)(1)(A), (B), (C) and (D).

140.    Contrary to its duties under ERISA, State Street failed to loyally and prudently manage the Plan's assets in the Daily Bond Market Fund.  State Street further failed to diversify the Plan's investments and did not act in accordance with the instruments governing the Plan.  Specifically, State Street breached its duties to the Plan participants, in violation of ERISA § 404(a), by, among other things:  (a) changing the investment strategy of the Fund to include investments fundamentally inconsistent with the represented strategy of the Fund; (b) investing Fund assets in high-risk securities, including securities backed by subprime mortgage loans at a time when the subprime mortgage market was collapsing; (c) exposing the Fund to even greater risk by using substantial leverage primarily through investment in derivative securities and/or securities purchased with short-term borrowings which were backed by subprime mortgage loans; (d) failing to maintain adequate diversification of the Fund's assets; (e) failing to invest and manage the assets of the Fund in the manner of a reasonably prudent fiduciary acting under similar circumstances; (f) allowing other plan sponsors to exit the Fund on as little as 48 hours notice earlier in August without providing that same right to Apogee; and (g) failing to notify Apogee and Plan participants of the facts described in items (a) through (f) above.

141.    State Street failed to conduct an appropriate investigation of the merits of its highly risky investment decisions even in light of the high risk of these inappropriate investments and the particular dangers that these holdings posed to the Daily Bond Market Fund.  Such an investigation would have revealed to a reasonably prudent fiduciary the imprudence of the investment decisions that State Street made.  A

reasonably prudent fiduciary would have managed the assets according to its represented strategy rather than engaging in leveraged, high-risk investing, as State Street did in this case.

142.   As a consequence of State Street's breaches of its various fiduciary duties, the Daily Bond Market Fund suffered enormous losses.  Had State Street appropriately discharged its fiduciary duties, the losses suffered by the Fund would have been minimized or avoided.  Further, Apogee was deprived of the benefit of the investment it believed it had made, mainly returns which would meet or exceed the Lehman Brothers Aggregate Bond Index.

143.   As a consequence of State Street's breaches of fiduciary duty, the Plan and its participants suffered millions of dollars in losses.

144.   State Street is liable for these losses because they were caused by its breaches of fiduciary duty.

145.   Apogee, on behalf of the Plan, is therefore entitled to relief from State Street in the form of: (a) a monetary payment to the Apogee Plan to make good to the Plan the losses resulting from the breaches of fiduciary duty alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (b) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a), 502(a)(2) and (3), 29 U.S.C. §§ 1109(a), 1132(a)(2) and (3); (c) injunctive and other appropriate equitable relief pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), to the extent applicable for knowing participation by a non-fiduciary in a fiduciary breach; (d) reasonable attorneys'

fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), and other

applicable law; (e) taxable costs and interest on these amounts, as provided by law; and

(f) such other legal or equitable relief as may be just and proper.

### STATE LAW CAUSES OF ACTION PLED IN THE ALTERNATIVE

146.   Apogee alleges that State Street and CitiStreet acted as ERISA fiduciaries

when they made the misrepresentations and omissions alleged in Counts One and Two

above.

147.   In the event that either State Street or CitiStreet denies that it acted as an

ERISA fiduciary when making those misrepresentations and omissions, then, in the

alternative, Apogee asserts the following state law causes of action.

### COUNT FOUR
### (Fraudulent Misrepresentation Under Minnesota Law – State Street and CitiStreet)

148.   Apogee incorporates the allegations set forth in paragraphs 1 to 147 as if

fully set forth herein.

149.   State Street and CitiStreet made misrepresentations and omitted to state

material facts necessary to make their statements not misleading, which were known (or

should have been known) to State Street and CitiStreet to be false and misleading, and all

of which were intended to induce Apogee to rely on State Street's and CitiStreet's

representations and omissions and not withdraw the Plan's assets from the Daily Bond

Market Fund.

150.   State Street and CitiStreet had actual knowledge of the misrepresentations

and omissions alleged herein, or acted with deliberate disregard for the truth in that they

failed to ascertain and disclose such facts.  State Street's and CitiStreet's material misrepresentations and/or omissions were done knowingly or deliberately and for the purpose and effect of concealing the truth in an effort to keep Apogee from withdrawing the Plan's assets from the Daily Bond Market Fund.

151.    The misrepresentations and omissions set forth herein were made by State Street and CitiStreet with the intent that Apogee would rely on them.

152.    Apogee reasonably relied on the misrepresentations and omissions of State Street and CitiStreet, as set forth herein, and as a result refrained from withdrawing Plan assets from the Daily Bond Market Fund until August 30, 2007.

153.    As a direct result of the materially false and misleading information, and failure to disclose material information as set forth above, the Apogee Plan suffered millions of dollars in losses.

154.    The misrepresentations and omissions of State Street and CitiStreet, as set forth herein, were the proximate cause of the damage to the Apogee Plan resulting from its having refrained from withdrawing from the Daily Bond Market Fund until August 30, 2007.

## COUNT FIVE
### (Negligent Misrepresentation Under Minnesota Law – State Street and CitiStreet)

155.    Apogee incorporates the allegations set forth in paragraphs 1 to 154 as if fully set forth herein.

156.    As administrative services provider for the Plan, State Street and CitiStreet owed Apogee a duty of care.

157.    State Street and CitiStreet breached their duty of care by negligently making the representations and omissions alleged herein.

158.    State Street and CitiStreet failed to use reasonable care when making the representations and omissions alleged herein.

159.    Apogee reasonably relied on the representations and omissions of State Street and CitiStreet, as alleged herein, and refrained from withdrawing the Plan's assets from the Daily Bond Market Fund until August 30, 2007.

160.    Apogee was justified in relying on the statements and omissions of State Street and CitiStreet.

161.    As a result of the negligence of State Street and CitiStreet, the Apogee Plan suffered millions of dollars of losses.

## COUNT SIX
### (Violation of Minnesota Prevention of Consumer Fraud Act – State Street and CitiStreet)

162.    Apogee incorporates the allegations set forth in paragraphs 1 to 161 as if fully set forth herein.

163.    As alleged above, State Street and CitiStreet used fraud, false pretenses, false promises, misrepresentations, misleading statements, and/or deceptive practices (collectively, "misrepresentations") in connection with the sale of units in the Daily Bond Market Fund to Apogee and Plan participants.  Such units constitute "merchandise" within the meaning of Minn. Stat. § 325F.69, Subd. 1.

164.    State Street and CitiStreet intended that Apogee and Plan participants rely on those misrepresentations.

165.     State Street and CitiStreet thereby violated the Minnesota Prevention of Consumer Fraud Act (the "CFA"), Minn. Stat. § 325F.69.

166.     State Street's and CitiStreet's violation of the CFA caused the Apogee Plan and its participants to suffer millions of dollars in losses.

167.     State Street and CitiStreet's misrepresentations also harmed the public. Their misrepresentations were held out to the public in violation of the CFA.  Their misrepresentations concern and harm the public, particularly given that they resulted in precipitous investment losses to many ERISA-governed retirement plans and their participants.  The public has an interest in preventing fraud in its financial markets, and the relief sought by Apogee will also benefit the public.

168.     Further, the Apogee Plan itself includes thousands of individual participants.  Thus, even when viewed solely in light of the Apogee Plan, a substantial group of the public was harmed by State Street's and CitiStreet's misrepresentations, and stand to gain relief as a result of this suit.

169.     Accordingly, Apogee is entitled to all relief available under Minn. Stat. § 8.31, subd. 3a as a result of State Street's and CitiStreet's violation of the CFA.

## COUNT SEVEN
### (Violation of the Minnesota False Statement in Advertisement Act – State Street and CitiStreet)

170.     Apogee incorporates the allegations set forth in paragraphs 1 to 169 as if fully set forth herein.

171.     As alleged above, State Street and CitiStreet advertised the Daily Bond Market Fund as described in Minn. Stat. § 325F.67.

172.     State Street's and CitiStreet's advertising of the Daily Bond Market Fund contained material assertions, representations, or statements of fact which were untrue, deceptive and/or misleading.

173.     State Street and CitiStreet thereby violated the Minnesota False Statement in Advertisement Act (the "FSAA"), Minn. Stat. § 325F.67.

174.     State Street's and CitiStreet's violation of the FSAA caused the Apogee Plan and its participants to suffer millions of dollars in losses.

175.     State Street and CitiStreet's false advertising of the Daily Bond Market Fund also harmed the public.  Their false advertisements were held out to the public in violation of the FSAA.  Their false advertisements concern and harm the public, particularly given that they resulted in precipitous investment losses to many ERISA-governed retirement plans and their participants.  The public has an interest in preventing false advertising in its financial markets, and the relief sought by Apogee will also benefit the public.

176.     Further, the Apogee Plan itself includes thousands of individual participants.  Thus, even when viewed solely in light of the Apogee Plan, a substantial group of the public was harmed by State Street and CitiStreet's false advertising, and stand to gain relief as a result of this suit.

177.     Accordingly, Apogee is entitled to all relief available under Minn. Stat. § 8.31, subd. 3a as a result of State Street's and CitiStreet's violation of the FSAA.

## **PRAYER FOR RELIEF**

WHEREFORE, Apogee prays for judgment as follows:

A.      A declaration that State Street and CitiStreet breached their ERISA fiduciary duties to the Plan and its participants;

B.      A declaration that State Street and CitiStreet are not entitled to the protection of ERISA § 404(c)(1)(B), 29 U.S.C. § 1104(c)(1)(B);

C.      A declaration that State Street and CitiStreet violated Minnesota law, including having engaged in fraudulent misrepresentations and negligent misrepresentations, and violating the Minnesota Prevention of Consumer Fraud Act, Minn. Stat. § 325F.69, and the Minnesota False Statement in Advertisement Act, Minn. Stat. § 325F.67.

D.      An order compelling State Street and CitiStreet to make good to the Plan all losses to the Plan resulting from their violation of ERISA and other applicable law, and to restore to the Plan all profits State Street and CitiStreet made through use of the Plan's assets, and to restore to the Plan all profits which the Plan and its participants would have made if State Street and CitiStreet had not violated ERISA or other applicable law;

E.      Actual damages in the amount of any losses to the Plan, to be allocated among the participants' individual accounts within the Plan in proportion to the accounts' losses;

F.      Imposition of a constructive trust on any amounts by which State Street and CitiStreet were unjustly enriched at the expense of the Plan as the result of their violations of ERISA and other applicable law;

G.      An order for equitable restitution and other appropriate equitable and injunctive relief against State Street and CitiStreet;

H.     An order requiring that State Street and CitiStreet pay all pre- and post-

judgment interest at the maximum lawful rate;

I.     An order awarding costs pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g),

and other applicable law;

J.     An order awarding attorneys' fees pursuant ERISA § 502(g), 29 U.S.C.

§ 1132(g), and other applicable law; and

K.     An order granting such other and further relief as the Court may deem just

and proper.

Dated:  January 26, 2009.                    **FAEGRE & BENSON LLP**

                                             s/Steven L. Severson
                                             Steven L. Severson (#152857)
                                                 *sseverson@faegre.com*
                                             Deborah A. Ellingboe (#26216X)
                                                 *dellingboe@faegre.com*
                                             Justin P. Krypel (#389385)
                                                 *jkrypel@faegre.com*
                                             2200 Wells Fargo Center
                                             90 South Seventh Street
                                             Minneapolis, MN 55402
                                             Telephone:    (612) 766-7000
                                             Facsimile:    (612) 766-1600

                                             **Attorneys for Plaintiff Apogee
                                             Enterprises, Inc., on behalf of the
                                             Apogee Enterprises, Inc. 401(k)
                                             Retirement Plan**

fb.us.3535393.10